## Mumford *vs.* The American Life Insurance and Trust Company.

The plaintiff being the holder of a bond and mortgage, and wishing to raise money from the defendants to pay a debt which he owed to a bank, proposed in writing to *sell* to the defendants certain installments of the mortgage to grow due, and as *collateral security* for the payment of the installments, to give his own covenant, and also the guaranty of the bank to which he was indebted. The proposal was accompanied by an assignment of the whole of the bond and mortgage, previously prepared and executed by the plaintiff, which was *absolute* in its terms, and contained a guaranty of the payment of the interest and collection of the principal, also by an engagement of the bank, reciting the plaintiff's indebtedness to it and that he had proposed *to sell* the said installments in order to pay such debt, and guaranteeing "*for the purpose of enabling the plaintiff to effect the sale*," the final collection of the said installments with interest. The proposal was accepted by the defendants, and the bond and mortgage with the assignment and the guaranty of the bank delivered to the defendants, they advancing to the plaintiff the amount of the installments mentioned in the proposal, in certificates of deposit issued by their own corporation. But at the same time, the defendants took from the plaintiff his own bond, conditioned absolutely, for the repayment of the sum advanced, and they also executed to the plaintiff a writing, acknowledging that they had received the as- [464] signment of said installments "*as collateral security*" *merely*, for the payment of the

plaintiff's bond. The transaction was entered on the defendants' books by their secretary as a *loan* to the plaintiff, but the secretary had no personal knowledge of the matter. The oral evidence delivered by the chief officer of the defendants, who was called as a witness by the plaintiff, tended to show that in thus consummating the transaction, no departure from the proposal of the plaintiff accepted by the defendants, was understood or intended. *Held,* that the transaction was a sale by the plaintiff to defendants of the installments of the mortgage, and not a loan to the plaintiff of the sum advanced; and therefore, that the transaction could not be impeached for usury.

The installments of the mortgage assigned were all payable in the course of six years, with interest, at the rate of seven per cent per annum. The certificates of deposit, issued by the defendants, for the same amount, were payable in London at the expiration of twenty years, with five per cent interest per annum. The difference in the rate of interest upon the securities received and those advanced therefor, did not render the contract, *per se*, usurious, even regarding the transaction as, in substance, a loan of money. *Per* McCoun, J.

The criterion by which to detect usury, where any thing is given besides money in consummating a loan, is the market value of that which is given, and the gain to the lender in charging and obtaining more than such market value. *Per* McCoun, J.

The charter of the defendants' company prohibited the "issue for circulation as money" of any of its own notes in the nature of bank notes, or certificates of deposit payable to bearer. A certificate of deposit, payable to bearer, but not adopted or intended for circulation as money, is not, it seems, within the prohibition.

The restraining statutes of this state, (1 R. S. 772; *Laws of* 1837, *p* 14,) are not violated it seems, by a foreign corporation, which, having power to make contracts and do lawful business within this state, keeps an office in the city of New-York, receives deposits of money in trust and issues certificates therefor, payable with interest, at a specified time; nor is it a violation of those statutes to issue such certificates in exchange for bonds and mortgages, received by the corporation.

A corporation created in our state may make contracts in another state, unless prohibited by its charter or the laws of the state where the contract is made. *Per* McCoun, J.

A party who receives securities issued by a foreign corporation in violation of the laws of this state, and then sells them for money, can not, it seems, maintain a suit in equity to annul the securities given by him in exchange, without returning those received by him, or the money realized on the sale.

When a plaintiff asks relief in equity on the ground of the illegality of a contract, the court will require him (except in cases of usury) to do equity as a condition of the relief.

The holder of a mortgage assigns several of the first installments thereof as collateral security for a loan, reserving the residue to himself. Afterwards, on default of the [465] mortgagor, he files a bill to foreclose, verified by his oath, in which he alledges, amongst other things, that the mortgage has been "duly assigned." A decree of foreclosure and sale is made, under which the mortgaged premises are sold, and purchased for the benefit of the plaintiffs in the suit. By the foreclosure, decree, and sale, the rights of the assignor and assignee of the mortgage became fixed so

Mumford *v.* American Life Insurance and Trust Co.

that the former can not impeach the assignment for usury or illegality. *Per* McCoun, J., and Bronson, Ch. J.

A payment made by the voluntary act of a debtor, can not be impeached on the ground of usury, except as to the excess over the principal and lawful interest.

Otherwise, it seems, where the payment is obtained by the creditor out of collateral securities in his hands, without the concurrence of the debtor.

Appeal from the supreme court in the third district. William W. Mumford filed a bill in the late court of chancery for the purpose of annulling an assignment made by him to the American Life Insurance and Trust Company of a bond and mortgage, executed by Elihu Ingersoll to Hollam Hutchinson, dated November 28, 1836, to secure the payment of the sum of $19,000, in eight equal annual payments, from January 1, 1838, with annual interest; also for the purpose of annulling a bond executed by the plaintiff to the said company, conditioned to pay the sum of $14,250, and a guaranty executed to the company by the Rochester City Bank, of the collection of the first six installments of the bond and mortgage so assigned, amounting to the same sum of $14,250. The instruments sought to be annulled were impeached by the plaintiff on the ground of usury; also on the ground that the transactions, of which they formed a part, were a violation of the laws of this state in restraint of banking; and also a violation of the charter of incorporation granted to the company by the state of Maryland. The original hearing of the cause, on pleadings and proofs, was had before Whittlesey, the late vice chancellor of the eighth circuit, who sustained the bill on the ground of usury, and granted the relief prayed for. The supreme court, on appeal, affirmed his decree, and the defendants appealed to this court.

*D. Lord,* for appellants.

*J. A. Collier,* for respondent.

McCoun, J. Our attention is called in the first place to [466] the character of the transaction; and the question is whether it was a sale of the first six installments of the Ingersoll bond and

mortgage, or a loan effected upon the security of a transfer of them?

In June, 1838, Wm. W. Mumford, a resident of Rochester, and the holder of the Ingersoll bond and mortgage for nineteen thousand dollars, payable in eight annual installments, with interest from the 1st of January, 1838, six of which installments amounted to $14,250; and being indebted at the same time to the Rochester City Bank in about that amount, which the bank was desirous should be paid, he prepared to raise the money for that purpose of the American Life Insurance and Trust Company, then doing business in the city of New-York, with which company it appears he had other transactions about the same period of time to a large amount. Whether he raised the money in question by way of a loan, or by a sale of the Ingersoll bond and mortgage accompanied by a guaranty, could make no difference to him, for either would equally well answer his purpose. It is probable that something had previously passed between him and the company on the subject, and therefore anticipating a sale, he prepared certain papers at Rochester to be offered to the company. These were, first, a deed of assignment, absolute in its terms, purporting to be founded on the consideration of $19,000, by which he (Wm. W. Mumford) sold and assigned to the Trust Company the Ingersoll mortgage, describing it particularly, and the bond also, and all the money due and to grow due thereon, whether principal or interest; with a covenant that the whole amount was due—that no payments had been made, and no set-off existed; and with a personal guaranty for the punctual payment of the interest and the final collection of the principal. 2d. A deed of the Rochester City Bank reciting that Wm. W. Mumford being the holder of the Ingersoll bond and mortgage, and being indebted to the bank, he had proposed *to sell and dispose of the bond and mortgage* for the purpose of applying the proceeds of the *six first installments* to [467] his indebtedness, upon receiving from the bank their guaranty of *those installments* and the interest to accrue thereon, *to enable him to effect the sale*; that Mumford, in pursuance of the arrangement, having executed an assignment of the bond and

mortgage bearing even date therewith to the trust company : therefore the bank guaranteed to the company the final collection of the six first installments with the interest which should accrue thereon, reserving the right upon any default in payment of principal or interest, to pay the company the amount unpaid, and to have the bond and mortgage assigned to the bank, if the bank should so elect. These instruments both bear date the 19th June, 1838, and appear to have been duly executed on that or the next day at Rochester. The execution of the assignment by Mumford was acknowledged before the recorder of Rochester, on the 20th June, 1838.

Next we find Mr. Mumford in the city of New-York on the 28th June, submitting a proposition in writing of that date to the Trust Company, " to sell and dispose of" to the company, the six first installments payable by the bond and mortgage, describing them and describing the property, and saying, that " as a collateral security to the company for the payment of the interest and the final collection of the principal, he is enabled to offer to the company (in addition to his own covenants) the authorized written guaranty of the Rochester City Bank, duly executed and ready to be delivered with the bond and mortgage, and the assignment thereof to the company."

Mr. Duer, the vice president and principal acting officer of the company, being examined as a witness on the part of Mr. Mumford, for the purpose of proving the acceptance of his proposal and how it was carried out, testifies, that the proposition contained in Mr. Mumford's written application for the sale of the six first installments was accepted by the company, he agreeing to receive in exchange or payment a certain amount in the certificates of deposit of the company, payable in pounds sterling in the city of London, and bearing an annual interest payable half yearly, of five per cent. The agreement, he says, as finally concluded, was for an exchange of certificates for the six first installments mentioned in the application. On his cross-examination, the witness says " he is positive in his recol- [468] lection that Mr. Mumford in making the proposition offered to receive certificates." We have thus far from the papers pre-

pared by Mr. Mumford and presented by him to the company, and from the testimony of his own witness in addition, the most positive and direct evidence of what the proposition was, of its acceptance by the company, and of Mr. Mumford's offer to take the certificates of deposit of the company in payment or by way of exchange; and that upon this basis the agreement was made, not for a loan of money, but for a sale and purchase of so much of the Ingersoll bond and mortgage. This evidence furnished by Mr. Mumford himself must have a controlling influence in the cause, unless the manner in which the contract was executed shall appear to be entirely irreconcilable with a sale, and show still more conclusively that the contract as made, was but a cover or disguise for a loan.

Some things occurred in carrying out the agreement which it must be confessed are calculated to change the ostensible character of the transaction. These are, 1st, the taking of Mumford's separate bond to the company in the penal sum of $28,500, conditioned for the payment of $14,250 in six equal annual installments, corresponding with the installments payable by the Ingersoll bond and mortgage, this bond bearing the same date as the assignment and the guaranty. 2d. A certificate signed by Mr. Duer as vice president of the company, acknowledging that the company held the Ingersoll bond and mortgage " as a collateral security" only for the payment of the bond of Mumford to the company, bearing date the 18th June, 1838, for the $14,250 in installments, and upon payment of that bond the assigned bond and mortgage were to be given up. This certificate bears date " August, 1838." These instruments show upon their face, that Mumford had assumed the relation of debtor to the company, that he was primarily to be looked to for the repayment of the $14,250 by installments with interest, and the Ingersoll bond and mortgage were but security collateral to his individual liability; a condition of things inconsistent with the idea of a purchase of the latter securities; but [469] though inconsistent, not intrinsically irreconcilable with the other acts of the parties, and the other phase of the transaction. It is doubtless open to explanation, how and why it was

that the bond and certificate were given; and Mr. Duer was called upon to give that explanation. On his direct examination, in answer to the question whether the above mentioned certificate signed by him, does not contain the final arrangement between the parties? He answered, "The two papers, I take it, are to be interpreted together. The one signed by me was not intended to be a departure from the agreement first acceded to, and is a different form of expressing the same thing." (The body of the latter was admitted to be in the hand-writing of Mr. Mumford.) On his cross-examination he was asked the object of his signing that paper, and he answered, it was to furnish evidence to Mr. Mumford of his right to receive the two last installments on the Ingersoll mortgage ; and according to his recollection, that was the only object: it had no other purpose. At the close, Mr. Duer was asked, without objection, whether he read the paper attentively at the time he signed it? And he said, "it certainly escaped my attention in reading it, that the Ingersoll mortgage was stated to have been assigned to the company as collateral security for the payment of Mumford's bond, instead of that bond being represented according to the terms of his proposition as a security for the payment of the six first installments of the mortgage: for I am perfectly certain that after his proposition was accepted, no such change as the terms of this paper seem to import, was made in the agreement between the company and Mr. Mumford."

With respect to the bond executed by Mumford, he says: "That Mumford's application of June 28, was doubtless immediately submitted to the finance committee or to the board— my impression is, to the finance committee—accompanied by a statement from me that Mr. Mumford would receive certificates at a certain rate, in payment of the six first installments on the Ingersoll mortgage, which he proposed to sell, and the proposition was acceded to." The original written proposition of Mr. Mumford contains no offer to give his bond, but offers to the company the guaranty of the bank in addition to his [470] own covenant. "And it was agreed between him and myself, that he should give a bond directly to the company, instead of

a covenant; but that bond was meant in execution of the agreement." Such, he says, must have been the case, from the fact of there having been a bond executed. In a subsequent part of his cross-examination, the witness explains, that he had no recollection of discussing the subject with Mumford, whether his covenant should be taken or his bond, but inferred it from the fact that a bond was taken; and as it appears that the bond bears an earlier date than the written application, he was satisfied that the discussion whether a bond should be taken or not, may have preceded the written application; and he infers also from a comparison of dates and some other facts, that the proposition to sell the six installments of the Ingersoll mortgage had been already made before the written application, and probably before the time at which the bond and the assignment bear date. This part of the testimony, which is given as matter of inference only, does not, however, lessen the effect of what the same witness had previously stated with more positiveness and certainty, respecting the object of the bond, as being a part of the agreement and to serve the purpose of a guaranty; and that it was not designed to change the character of the transaction, or to give it a complexion different from the one agreed upon, and which the parties were then intending to carry into effect. But there is one other piece of evidence to be noticed in this connection, and which is relied on to show that it was a loan; viz. the entry made in the books of the company. It was there entered, says Mr. Thurston, the secretary, to the debit of the account of loans on bond and mortgage; and that, too, to the debit of Mumford, in the same manner as if it had been a loan to him on his bond and mortgage. No account was opened with Ingersoll. This was the act of the secretary, who says he had no personal knowledge of the transaction. It does not appear that he stopped to inquire whether it was a loan or a purchase. The distinction might not have occurred to him, or if it did, it could make no difference how it was entered [471] in their books. The figures would be the same. The debits and credits would be alike in either case. It was necessary to open and keep an account with Mumford, because he

had a residuary interest in the Ingersoll bond and mortgage, and would be entitled to a return of the securities when the six installments were paid; and whether he was charged with $14,250 advanced as purchase money, or on loan, could make no possible difference to him, nor prejudice his rights in any degree. Besides, calling it a loan, did not in fact make it so. The entry at most would be only prima facie evidence, and by no means conclusive; and, like some other evidence in the cause, open to explanation, and liable to be controlled by facts admitting of no mistake.

The like remarks are applicable to the manner in which the transaction is spoken of in the petition presented to the court in behalf of the company in the foreclosure suit; and which, it is said, was verified by Mr. Duer's signature and oath, on the 4th of October, 1841, wherein the assignment is stated to have been made by Mumford to the company as collateral security for the payment of his bond; following in that respect the allegation of the foreclosure bill.

The loose way of consummating the business, and of thus speaking of it afterwards, are, it must be admitted, pretty strong indications of its being a loan; but the preponderance of evidence is in favor of considering the transaction a sale of the Ingersoll securities, to the extent of the six installments; and that in carrying the sale into effect, the parties did not intend to deviate or depart from the terms originally proposed. The controlling evidence on this subject is furnished by Mr. Mumford himself, in his written proposals—in the assignment which he prepared and executed—in the guaranty of the bank which he procured and tendered, and in the testimony of Mr. Duer, his witness; and when all this is considered, it seems to me we ought not to hesitate about giving to the transaction the character of a sale. If this is left equivocal, and a doubt remains of its being a loan, we are bound to give the company the benefit of that doubt; but I think the evidence places it beyond [472] a reasonable doubt, that here was an intentional sale and exchange of securities, and not a loan. Nor is there evidence

in the case by which we are authorized to say, that though in form a sale, it was but a cover or a disguise for a loan.

If this is the truth of the case, then it is not within the statute against usury, whatever may have been the loss sustained by Mumford in the sale of the certificates of deposit, or whatever profit the company may have made by the bargain. (*Dry Dock Bank* v. *American Life Insurance and Trust Co.*, 3 *Comst.* 344, 358.)

But suppose the transaction to have been a borrowing and lending between the parties, then was there usury in it, such as the statute forbids?

To determine this question, we must first ascertain what was loaned; whether the mere credit of the Trust Company, or money, or a substitute for money? Usury cannot be predicated of the use which one person may be allowed, or authorized to make of another's credit, as is very clearly shown in the opinion of the court by Gardiner, J. (3 *Comst.* 356,) because credit, a " capacity of being trusted," is neither money, goods, nor a chose in action. In this case, however, it was something more than a credit in that sense which Mumford sought for and obtained. It was money that he wanted for the purpose of paying a debt to the bank, and he sought to raise it upon the strength of the security of the Ingersoll bond and mortgage, accompanied by his own obligation and the guaranty of the bank. The Trust Company not being prepared to part with so much money, he proposed to take their certificates of deposit so called, payable in British sterling at a future day in London, with interest at five per cent, and these the company agreed to issue, and did accordingly make out and deliver to him. Their amount in currency was ascertained, and at that amount they were taken. If, therefore, it can be called a loan, it was substantially a loan of so much money, though in form choses in action. In Mumford's hands even, they were valid as evidences of debt against the company, because he had given value for them in other securities. They were not naked promises, nor bare [473] licenses to raise money on the credit of the company.

Hence not loans of credit but of things in action, equivalent to money, capable of engendering usury.

The next inquiry then is, whether the company as lenders, have reserved, or taken any thing in the shape of interest, or gained any advantage in the way of a profit to themselves, exceeding the lawful rate upon a loan? Only seven per cent interest is reserved to be paid in and by the securities taken for the payment of the $14,250. It is not pretended that any thing more was *directly* reserved or agreed to be paid, or has ever been exacted as an inducement for making the loan. *Indirectly* has the company made a profit out of the borrower to swell the interest beyond seven per cent?

The testimony shows that in the sterling certificates of deposit, with two small sums added and taken into the account, the full amount of $14,250 was advanced and paid to Mumford. The English sovereign, or pound sterling, which are equivalent, was computed at $4,85, that being the intrinsic value of the sovereign in the United States, according to the quantity of gold it contains; and this allows of an addition, or premium of nine per cent and a fraction over, on $4,44⅘, the artificial or nominal value, in our currency, of a pound sterling, to make it equal or par with the sovereign. Turning the sterling certificates into currency therefore, at $4,85, was allowing to them their par value; and at the same valuation or rate, the holders of them will be entitled to receive payment in London when they fall due, and the company is bound to provide funds to that amount to meet them there. It is clear, therefore, that there has been no overcharge in the value of the certificates and no gain to the company on that score. Indeed, I do not understand the counsel to contend that any advantage in that way has been gained.

The complaint is, that the certificates being in sterling money payable in London and intended for that market, and not being saleable in New-York, Mumford has been put to expense in sending them forward and in obtaining an advance upon them, and finally subjected to a considerable loss in the sale, owing to their depreciation in London. But is the company [474]

chargeable with these consequences as making out a case of usury? In order to get at usury, the proper and only inquiry is, what has the lender gained in the way of interest or profit; not what has the borrower lost, unless the lender has derived some benefit from such loss. The proposition, I think, is undeniable, that usury can not be made out of the losses of the borrower in converting what he receives upon the loan into money, unless some benefit arises out of the transaction to the lender which swells the interest or profit he makes, to more than the legal rate. For instance, a loan of a certain amount is agreed to be made at seven per cent. The lender puts off upon the borrower bank bills, or stocks, or notes of third persons at their face, or par value, which at the time in his hands were depreciated, and they are necessarily sold at a discount by the borrower; this is usury, because the borrower is thereby subjected to the payment of more than seven per cent on the sum actually received; and the lender is benefited, because he gets an interest on more than the value in money of what he has parted with in making the loan. But this is not the case, and no benefit in that way can result to the lender; when he issues his own note or gives his own bond for the sum agreed to be loaned, because he is bound at all events to pay the full amount of what he thus issues. If usury can arise from that method of carrying out a loan, it must be from some other cause or circumstance connected with the transaction. Thus, for example, if the lender should make his note or his bond issued for the loan, payable at a future day without interest, reserving at the same time full interest on the amount from the date, this would be usury, because of the obvious advantage gained by the lender in interest. Perhaps facts might exist to explain away that advantage, as in *Knox* v. *Goodwin*, (25 *Wend.* 643.) And this brings us to the only remaining inquiry in the case respecting usury, which is this; whether the difference between seven per cent interest which the company was to receive during the six years allowed for the reimbursement by installments, and the five per cent which they are to pay in London during twenty years, [475] upon their sterling certificates is, per se, usurious? In the

Dry Dock Bank case, (3 *Comst.* 345,) this question was not nakedly presented as it is here. The facts there did not call for any distinct expression of opinion upon this point; but in *Carroll* v. *The Farmers' Loan and Trust Co.* (5 *Barb. S. C. Rep.* 613,) the supreme court of the seventh district passed upon the question, and held that such a difference of interest in a similar way of effecting a loan, was upon the face of it, usurious. I must be permitted to deny, and I do so with the greatest respect for the opinions of my brethren of the seventh, that mere difference of interest between seven per cent reserved by the lender and a lesser rate payable upon, or to arise out of what is furnished as the substitute, or representative of money, constitutes of itself usury, and renders the transaction void on its face. Any arithmetical calculation showing how much may be gained by the lender, or how much lost by the borrower from difference of interest alone, can not have that effect, for such a calculation is only applicable to the case of an *exchange* of securities, and not to the case of a loan of them as money.

Usury must have some other basis than the difference between seven per cent stipulated for the loan, and any lesser rate payable by " things in action" delivered to the borrower; because it by no means follows that what is thus furnished as money, is not worth its face. There are many kinds of stocks and public securities drawing an interest of less than seven per cent, that always command their full par value. Look for instance at the six per cent government stocks, how much above par they range in the market as means of investment for capital, and even the five per cents, having a number of years to run, are so desirable for permanent investment, as often to command a premium when offered for sale. Suppose then a lender, instead of furnishing the money agreed to be loaned, should deliver to the borrower the scrip of a five per cent stock, or bonds or securities of some sort drawing five per cent interest, and these should readily command the full amount of their face in the market at the time, would any body say the lender was guilty of usury ? He would in that case part with the equivalent to him of so much money which the borrower would at once [476]

realize, and for which he would afterwards pay the lawful interest and no more. The rate of interest receivable upon the securities thus disposed of would no longer concern the borrower. It would belong to the holder of them. I therefore say that in a matter of loan effected through or by means of a delivery of securities drawing four, five or six per cent interest, (and it is immaterial which, the principle being the same,) the borrower agreeing to pay seven per cent, the difference of one, two or three per cent in the respective rates, would not of itself alone constitute usury : and for the simple reason, that the securities received by the borrower might notwithstanding be equal in cash value to the sum proposed to be loaned. It is therefore easy to perceive that in all such cases nothing is gained towards establishing a criterion for usury, by considering the difference in the rates of interest, or by calculations of their comparative values to the holders of the different securities. The only criterion by which to detect usury, where any thing is given besides money in consummating a loan, is the market value of that which is given, and the consequent gain to the lender in charging or obtaining more than such value. Such value is susceptible of proof, and it is only from the evidence of value and gain that the court can have a right to determine whether a usurious advantage has been taken by the lender in such a transaction. The difference of two per cent is all that he gains upon the face of it. He pays five per cent interest on the bonds given instead of ready money, and receives seven per cent on the securities taken for the loan nominally of the same amount. His profit is therefore but two per cent, and this is not in addition to the seven ; for it is only what is left of the seven after paying out five—and this is only at the rate of two per cent per annum, and not for such shorter period as might possibly make it exceed the rate of seven per cent a year. And what is this two per cent for? It arises out of the exchange of liabilities which the parties reciprocally assume towards each other, and it is strictly a compensation agreed to be made by one to the other for the use of that other's superior [477] credit as a means of raising money : and we have seen

that usury can not be affirmed of such a transaction. (3 *Comst.* 356, 358, 9.)

This two per cent is certainly not a "premium" for the use of money or for its loan or forbearance, which is the definition of "interest" such as the statute concerning usury undertakes to regulate, for no money has in fact passed between the parties; and therefore it has always seemed to me that a difficulty exists in ever giving to an exchange of one man's notes, bonds or legal liabilities which he chooses to issue, for another of similar character as between themselves, the effect or character of a loan of money within the meaning of the statute. I admit however the doctrine is too well settled to be now controverted, that such an exchange may under circumstances be regarded as covering a loan; yet if I am not greatly mistaken, the difference of interest is not, of itself, by any possibility an ingredient of usury in such a transaction. According to the views which I have thus endeavored to present of the case, treating it even as a loan, the company are not chargeable with usury, either because of the loss sustained by Mumford in the negociation or sale of the certificates of deposit, or by reason of the two per cent difference of interest.

We are now to consider other objections taken on the part of Mumford to the transaction, and on which it is insisted he is entitled to relief. These relate to alledged violations of the charter of the company, and of the restraining laws of the state.

The only ground on which the first is put by his bill of complaint, is that the manner of making the certificates payable to the order of the secretary, was a mere shift or device to evade the letter and spirit of the charter of the company, (being in substance and legal effect payable to bearer,) and that they were so made and issued within the prohibition contained in the charter. Hence they were unauthorized and when issued were absolutely void, and furnished no legal or valid consideration for his bond and the assignment of the Ingersoll mortgage. Some other grounds will be found stated in the counsel's points used on the argument, but which are not made a part of the bill, and therefore are not to be noticed.

[478] The power of the company to issue certificates of deposit for certain purposes is not disputed. There is an express authority to receive from any free person any deposit of money or securities valued as money in trust, and to allow interest thereon —also " to make all kinds of contracts in which the casualties of life or interest of money are involved"—likewise " to fix the places and mode of transfer of certificates of stock, deposit and payment of interest." (*Charter*, § 5.) By the 6th section the company is forbidden " to issue for *circulation as money*, any of its own promissory notes *in the nature of bank notes or certificates* of deposit payable to bearer." The certificates in question were not drawn payable to bearer on their face; still that was their legal effect immediately when issued. They had no validity as against the company in the hands of Thurston the secretary, to whose order they were drawn payable, for he had given no value for them. Under his indorsement in blank they first took effect, and by that act of his they were virtually made payable to bearer. But the mere circumstances of thus making them payable to bearer, does not bring them within the prohibition. The mischief intended to be guarded against by the sixth section was the creation of an issue of notes or other evidences of debt for circulation like bank notes. These certificates were not calculated for such purpose. They could not well be used in that way. They carried on their face the evidence of a contrary intention. The lengthy form of the instrument—the time when payable—and in foreign money, with interest semi-annually—the place of payment for both principal and interest, all go to show they are not of the class or description of issues which were intended to be prohibited by the charter. Besides, it appears from Mumford's own showing that these certificates were obtained by him, not for circulation in Maryland or New-York, but for sale in London, to which place they were sent, and where they were disposed of on his account.

Next, is the objection founded on the alledged infringement of the laws of this state.

The bill alledges that this company (a foreign corporation) did, at the time of the transactions with Mumford, and without

being thereunto authorized by any law of this state, *em-* [479] *ploy* its effects or some part thereof, at the city of New-York, and become interested in a fund then and there *employed*, for the purpose of *receiving deposits*, or of *issuing notes* or other evidences of debt, *to be loaned* or *put in circulation as money*, contrary to the provisions of sections 1, 3 and 5 of the statute against unauthorized banking, &c. (1 *R. S.* 712.) And that the company did also at the same time, keep an office in the city of New-York for the purpose of *receiving deposits ;* and also for the purpose of *issuing evidences of debt to be loaned or put in circulation as money*, contrary to the 6th section of the same statute. And it then insists that the loan of the certificates to Mumford was illegal and void, as being in violation of those sections. All these allegations and the illegality of the transaction are denied in the answer.

The provisions of the statute above referred to, were so far repealed or modified by an act passed February 4, 1837, (*Laws of* 1837, *p.* 14,) as to permit any person or *association* of persons *not incorporated*, to keep offices for the purpose of receiving deposits, or discounting notes or bills. But it is declared that this modification is not to authorize or permit " any corporation created by the laws of any other state or country, to keep any office for the purpose of receiving deposits, or discounting notes or bills, or issuing any evidence of debt to be loaned or put in circulation as money within this state."

This company could not therefore lawfully engage in any business, which to every foreign corporation is prohibited in this state as a matter of domestic policy. Has this company done so ? It is not denied that the company opened and kept an office in Wall-street in the city of New-York, where for several years, and at the time of the transaction with Mumford, the principal part of the business of the company was conducted under the management of officers and directors appointed for the purpose ; but the complainant is bound to prove more than that. The burthen is on him to show that the business transacted belonged to the class or description of prohibited business. We can have no difficulty in understanding what that is. The

[480] necessity for regulating the business of banking by wise and wholesome laws; placing it upon the footing of a franchise granted by the state, and guarding the community against its abuses, called at the same time for the protection of the privilege, by such prohibitions and penalties as we have in our statutes. It is therefore to be regarded as a part of the system adopted with reference to banking business in this state; and the prohibition can only apply to prevent such business being done by individuals or companies not having banking powers, as is usually and ordinarily pursued by banks of issue, and of discount and deposit. How far did the general business of this company resemble banking? Mr. Duer says " the general business of the company consisted very much in the business authorized by the charter, receiving deposits and issuing certificates therefor, making investments of their funds, and making insurances on lives."

Mr. Thurston was also required to state the nature of the business done at their office in New-York, and he says " we received deposits of money in trust, insured lives, made loans on bonds and mortgages and other securities. This comprises the principal business." With respect to certificates issued by the company he says, the amount issued at the office in New-York during the year 1838 was £535,434 sterling payable in London, 500,000 in francs payable in Paris, and $761,563 payable in New-York. The larger portion of all these were drawn to his order and indorsed by him; they were generally, and the larger portion, issued for money paid to or received by the company from the parties receiving the certificates, and entered on the books as deposits in trust. Those issued not for money so received were principally in exchange for bonds and mortgages and other securities. The money so received or deposited, and for which certificates were issued, was principally loaned out on bond and mortgage. The company, he says, was also engaged in the city of New-York in buying and selling exchange, and in the purchase and sale of stocks. Now it seems to me that all this is outside of the general routine of business conducted by our banks. Here are, it is true, deposits of money spoken of as having been [481] made, but they were deposits in trust, upon interest, for

which the depositer received a certificate payable at a specified time, constituting a contract under which the money could not be called for, until the time had elapsed ; a very different thing from a deposit made with a bank in the ordinary course of business, which is entered to the credit of the depositer, and is to be drawn for at pleasure and without interest.

There is no proof furnished of the company's discounting any bills or notes at any time; and with respect to the issue of their certificates of debt, there is no evidence that even that portion of them which were payable here in our own currency, were put in circulation in the place of money like bank notes, or were calculated or intended for that purpose ; and much less probability is there that those which were payable in foreign coin in London and Paris, were thus to be used here, or even could be. But to enable Mumford to avoid his contract with the company on the ground, either of the disregard of their own charter or of the restraining law of this state, he should show that the particular contract itself was entered into by the company, in violation of the one or the other, or both. He can not avoid it, because the company may have carried on a course of unlawful dealing with other persons, any more than he could get rid of the payment of a note or bond, by showing that the payee or obligee was a notorious usurer, and generally in his dealings took excessive interest. The cases in which the question has arisen upon the statute against unauthorized banking were cases of actions brought upon contracts shown to have been unlawful in themselves, or to have grown out of transactions forming a part of the forbidden business. (*Pennington* v. *Townsend,* 7 *Wend.* 276 ; *De Groot* v. *Van Duzer,* 20 *id.* 390 ; *New Hope Co.* v. *Poughkeepsie Silk Co.* 25 *id.* 648.)

Then was there any thing about the contract or dealing between Mumford and the company to render it unlawful by the statute ? It took place at their office in Wall-street, where the principal part of the business was conducted, but this did not render it unlawful. There is nothing in the charter of this company, nor in the laws of this state, which prevented its officers and agents from making contracts any where in this state.

[482] Corporations created in one state may transact such business as their charters authorize, in another state, provided the transaction of such business is not contrary to the known policy of that state, and is not injurious to its public interests; and contracts growing out of such transactions may be enforced, if not otherwise unlawful. (13 *Peters,* 520; 4 *How.* 16.) The contract had no connection with an actual deposit of money or the discount of any bills or notes. According to Mr. Mumford's statement of the transaction, it was an agreement for a loan to him on the security of bonds, and a guaranty and a mortgage of real estate. In that there was nothing unlawful. The loan was carried out by the delivery to him of certificates of deposit so called, instead of money. In this there was no offence against the statute we are considering, unless indeed the certificates were designed as evidences of debt to be loaned or put in circulation as money, within the meaning of the statute. We have already seen they were not of that character, and could not be used for a purpose so foreign to their object.

But if my view should be erroneous and the complainant should appear to be entitled to relief upon any ground except that of usury, does he present himself to the court in a proper manner to receive it? He obtained the company's certificates, or bills of credit to a large amount, and if they were issued contrary to law, he is in *pari delicto;* and by directly or indirectly assenting to receive them, he, as well as every other person engaged in the transaction, incurred the penalty declared by the seventh section of the statute. He was instrumental in putting these certificates into the market, where they were sold for his benefit and he has received the avails. There is no evidence that the company has ever sought to repudiate them. Mumford's sale of them has given to the purchasers a right to rely on the honesty and good faith and ability of the company to pay them. How then can Mumford be allowed to set up their illegality and withdraw from the company the securities which he furnished, on which its ability to pay in some measure depends? He comes into a court of equity, and by virtue of its general jurisdiction, asks the court to undo a contract and

restore to him property which he has parted with. He [483] makes no offer to return the certificates, or to give up any of the money received from the sales, as a condition of having the securities restored ; and there is no statute requiring the court to dispense with the requirement of his first doing equity who asks for equity, as a condition of relief, except where relief is asked because of usury. If upon any other ground of illegality the court should be bound to grant the relief, it can only be upon the performance of such a condition. (2 *Story's Eq.* §§ 693, 694.)

There is still another point in the case which it may be worth while briefly to notice, and that is, as to the legal effect of the proceedings, and decree, and sale, in the foreclosure suit upon the Ingersoll mortgage. The answer sets up those proceedings as a bar to any relief in this suit. It can only be necessary however, to examine this part of the case upon the supposition that there is enough in one or more of the other points to produce a different result from what I have arrived at. The bill in the foreclosure suit, filed by Mr. Mumford, in the joint names of himself and the company, recognizes very fully the right of the company to be paid out of the mortgaged property. The decree asked for and obtained upon a master's report of the amount due and to become due and of the propriety of selling the whole premises, was for a sale of the whole and for the proceeds to be paid to the company and himself. True, it does not specify how much to each. No distinction is made between them, and no reservation. It is as much a judgment or decree, establishing the right of the company to be paid, as the right of Mumford. Is it not therefore, as definitive between them upon the matter of right, as if they had been adverse parties to the suit ? I perceive no difference. Again. The decree thus obtained has been followed by a sale made by an officer of the court, a regular and valid sale which remains in full force ; not yet consummated it is true, by the delivery of a deed to the purchaser, nor by the actual payment and application of the purchase money ; but in equity, the title to the land is already virtually in the purchaser ; and the plaintiffs in the foreclosure

suit are in possession of the money.   The debt is paid *pro tanto.* [484] The mortgage is satisfied.   It has performed its office. There is the end of it.   New rights have been acquired by these proceedings and a new relation created between these parties, which neither is at liberty to depart from without the consent of the other.

It appears to me therefore, that Mr. Mumford and his representatives are estopped from setting up usury, or any other illegality, to defeat the rights of the company, as the assignee of the Ingersoll mortgage, or to deprive them of any interest they may have acquired by the sale, either as purchasers of the land through the medium of the solicitor's bid, or as recipients of the money produced by it; and that the only thing now remaining to be done between the litigant parties, is to adjust between themselves the value of the property to the company as purchasers, to be credited on Mumford's bond and the guaranty of the bank, and to take the directions of the court below for perfecting the title in them accordingly, or in George H. Mumford the nominal purchaser, with directions to him to resell the property and apply the proceeds as above mentioned.

The judgment of the supreme court appealed from, and the decree of the late vice chancellor, which that judgment affirmed, should both be reversed, and the bill be dismissed with costs.

BRONSON, Ch. J.   Mumford alledges that his assignment of the mortgage to the Trust Company was illegal and void, on the ground of usury; and also on the ground that the company violated our restraining law, and its own charter.   For these reasons he seeks by the bill to get rid of his bond and assignment to the company, and to have the master's deed executed to himself.   Whatever objection there may have been originally to the transaction, I think Mumford is not now at liberty to say that the assignment was illegal and void.   It is in direct conflict with what he did and said when he caused the bill to be filed for the foreclosure of the mortgage.   He then not only used the name of the Trust Company as a necessary party to the bill, but he alledged, and swore to the truth of the allega-

tion, that the mortgage had been "duly assigned" by [485] him to the company. He stated further, in effect, the extent of their respective interests in the mortgage debt; thus showing why both he and the company were made complainants in the bill. On these allegations the cause proceeded to a hearing and a decree of foreclosure. A sale followed, and the property was bid off by the solicitor for the benefit of his clients. Every thing but a mere matter of form—the execution of a deed—was completed. The company was, in effect, paid its debt so far as the mortgaged premises would pay it; and if any thing remained after satisfying the company, it would go to Mumford to the extent of the last two installments of the mortgage debt, which belonged to him. The rights of the parties were fixed, and it was then too late for Mumford to say that there was no valid assignment of the mortgage, and that the company had no rights under the sale. He had not only alledged in a court of record, and sworn to the fact, that the mortgage was duly assigned: but on this basis he had acted and carried forward a judicial proceeding to a decree, and a final consummation, with the exception of the mere formal act of furnishing the proper evidence of the sale by a conveyance. There is no principle upon which he can now be allowed to stop short, and alledge that all he has said and done is false, and shall go for nothing. The company has the right, by affirming the sale, to consider its debt paid, if the land is of sufficient value for that purpose. This payment has been made by the voluntary act of Mumford: and money paid on a usurious debt can not be recovered back. Nothing but the excess beyond the loan and legal interest can be recalled.

If the company had foreclosed the mortgage without the concurrence of Mumford, he might perhaps still alledge that the assignment was void for usury, and treat the company as trustees for him. But that would be a very different case from this, where Mumford directed, and was a party to, the foreclosure suit, and where he continually affirmed the validity of the assignment, and carried forward the proceedings until they resulted in the satisfaction of the company's debt, so far as the

mortgaged premises will satisfy it. A payment thus made by [486] the voluntary act of the debtor, is a very different thing from one obtained by the creditor out of collateral securities, without the act or assent of the debtor.

If we assume that Mumford is right in any or all of the objections which he now urges against the assignment, the objections came too late. I am of opinion that the decrees of the courts below should be reversed, and the bill be dismissed.

JEWETT, J. also delivered an opinion in which he only considered the question whether the transaction was a sale of the six first installments of the Ingersoll bond and mortgage, or a loan by the Trust Company to the plaintiff of the sum which the latter received in the certificates of the company. He came to the same conclusion with McCoun, J. that the transaction was a sale.

A majority of judges were of opinion that the contract did not involve a loan, but was a mere sale and purchase of the six installments of the bond and mortgage; and upon the whole case the decrees of the vice chancellor and supreme court were reversed, and the bill directed to be dismissed.